**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**JOHNSON CONTROLS, INC.,**

        **Plaintiff,**

v.                             **Case No. 8:07-cv-1808-T-17TBM**

**JEFFREY W. RUMORE; WILLIAM M.**
**NULTON; STEVE GRIFFIN; NEVIN**
**WHERRELL; COMFORT**
**SYSTEMS USA (SOUTHEAST), INC.,**

        **Defendants.**

_____/

**REPORT AND RECOMMENDATION**

    THIS MATTER is before the court on referral by the Honorable Elizabeth A.

Kovachevich for a Report and Recommendation on **Plaintiff's Second Amended Motion for**

**Preliminary Injunction** (Doc. 23)[1] and Defendants' response in opposition (Doc. 69).  The

parties filed numerous deposition transcripts, affidavits, and other exhibits in support of their

respective positions.[2]  A hearing on the motion was conducted on December 13, 2007.

_____

    [1]**Plaintiff's Motion for Injunctive Relief** (Doc. 2), **Plaintiff's Amended Motion for**
**Temporary Restraining Order** (Doc. 9), and **Plaintiff's Amended Motion for Preliminary**
**Injunction** (Doc. 10) are **DENIED as moot**.

    [2]The parties filed an **Agreed Motion to Seal Deposition Transcripts and Exhibits**
(Doc. 74).  As discussed at the hearing, the court has declined to seal these submissions, and
the motion is **DENIED**.  However, they have been stricken from the public docket and
admitted instead as a collective hearing exhibit, Plaintiff's Hearing Exhibit 1 ("Pl.'s Hrg. Exh.
1"), which contains each of the depositions referenced herein.

I.

A.

Plaintiff initiated this action on October 4, 2007, by filing a Verified Complaint for

Damages and Injunctive Relief (Doc. 1) as against Rumore and Comfort Systems USA

(Southeast), Inc. ("Comfort Systems").  Plaintiff filed a Verified Amended Complaint for

Damages and Injunctive Relief ("Complaint") (Doc. 20) adding as defendants William Nulton,

Steve Griffin, and Neven Wherrell.[3]  By its Complaint, Plaintiff asserts claims for breach of

covenant not to compete by the each of the four Individual Defendants (Counts I-IV); breach

of covenant not to disclose confidential information by each Individual Defendant (Counts V-

VIII); breach of covenant not to solicit customers by each Individual Defendant (Counts IX-

XII); breach of covenant not to solicit employees by Nulton (Count XIII), Rumore (Count

XIV), and Wherrell (Count XV); Breach of Duty of Loyalty[4] by each Individual Defendant

(Counts XVI-XIX); fraudulent misrepresentation and conversion by Rumore (Counts XX-

XXI); conversion by Griffin (Count XXII); misappropriation of trade secrets by each of the

defendants in violation of  Florida Statutes section 688.001 (Counts XXIII-XXIV); tortious

_____

[3]Individual Defendants Wherrell and Griffin are former employees of Johnson Controls
who each signed an agreement containing confidentiality, nondisclosure, nonsolicitation, and
noncompetition provisions similar to those within the Rumore and Nulton Agreements.  After
terminating their employment with Johnson Controls, Wherrell and Griffin became employed
by Comfort Systems.  As announced at the hearing, Plaintiff has reached a settlement with
Defendants Griffin and Wherrell, and it withdraws its request for injunctive relief as to these
two defendants.

[4]The Complaint reads, "Count XVI - Duty of Breach of Loyalty by Griffin."  (Doc. 20
at 36).  The court assumes that the words, "duty" and "breach," are transposed as a result of a
scrivener's error.

2

interference with a contract by Comfort Systems (Count XXV); tortious interference with a

business relationship by Comfort Systems (Count XXVI); unjust enrichment against Rumore,

Griffin, and Comfort Systems (Count XXVII); and violations of the Computer Fraud and

Abuse Act, 18 U.S.C. § 1030, by the Individual Defendants (Count XXVIII).  (Doc. 20).

By its allegations, Plaintiff Johnson Controls, Inc. ("Johnson Controls") is a

Wisconsin corporation and the successor by 100% stock purchase and merger to York

International Corp., Engineered Services Group ("York" or "York/ESG").  Johnson Controls

is engaged in the building controls industry and engineers, manufactures, and installs heating,

ventilation, air conditioning, lighting, and fire safety equipment into buildings and provides

maintenance services for building control units in Florida and elsewhere.  In its business, it

develops and compiles valuable confidential business information related to the design of its

systems, maintenance schedules, customer information, pricing, and the like.  It seeks to keep

such information confidential, and it provides specialized training to its employees.

In November 2002, York/ESG hired Defendant Jeffrey W. Rumore as a Sales

Account Executive for its Central Florida region.  Rumore executed a Confidentiality and Non-

Competition Agreement ("Rumore Agreement") (Doc. 20, Exh. A) as a condition of

employment.  Among other things, this Agreement provided for the following:

1.  Rumore acknowledged and agreed that he would come in contact with and have

access to trade secrets, proprietary information, and confidential information, which he agreed

to hold in the strictest confidence and agreed not to disclose, divulge, or reveal such trade

secrets or confidential information to anyone during or after his employment.  *Id.* at ¶ 1.

3

2.  For six months following the termination of his employment, he would not engage, directly or indirectly, in any business that manufactures, distributes, or sells products similar to those manufactured or distributed by York/ESG during the last twelve months of his employment.  *Id.* at ¶ 2.

3.  For six months following the termination of his employment, he would not aid or endeavor to solicit or accept any business from or do any work relating to previously identified potential customers or any customers during the last twelve months of his employment or disclose the names or addresses of York/ESG's customers or former customers.  *Id.* at ¶ 3.

4.  For sixth months following the termination of his employment, he would not aid or endeavor to solicit or induce any other employees or consultants to leave their employment with York/ESG in order to accept employment with any other business with which Rumore is or may become associated.  *Id.* at ¶ 4.

5.  Immediately upon the termination of his employment with York/ESG, Rumore would return to it all the materials in his possession or control relating to the business of York/ESG.  *Id.* at ¶ 5. The parties agreed that York/ESG could pursue injunctive relief if Rumore breached or threatened to breach the agreement following the termination of his employment with Johnson Controls, as well as "attorneys' fees, losses, expenses, damages or other monetary remedies available at law or in equity."  *Id.* at ¶ 7.

Rumore continued to work for the company after Johnson Controls purchased York/ESG.  Rumore resigned on May 1, 2007.  Plaintiff alleges Rumore went to work immediately for Comfort Systems, a mechanical contractor also engaged in HVAC installation

4

and service.[5]  Rumore's duties with Comfort Systems are alleged to be substantially similar to those he performed for Johnson Controls, and Plaintiff alleges that in his new position, he solicited or induced at least seven Johnson Controls employees to terminate their employment with Johnson Controls and to accept employment with Comfort Systems and that he unsuccessfully solicited another five employees of Johnson Controls to do the same, and that he also successfully solicited at least one of Johnson Controls's customers, GE Aviation, to cancel its contract with Johnson Controls and then do business with Comfort Systems.[6]

Plaintiff also alleges that in February 2004, York/ESG hired William M. Nulton as a National Sales Executive.  Nulton executed a Confidentiality Agreement ("Nulton Agreement") (Doc. 20, Exh. B) in consideration for restricted stock or a deferred cash equivalent.  The Nulton Agreement, while different from that signed by Rumore, contained a number of provisions similar to those in the Rumore Agreement, including an acknowledgment that he would become acquainted with and have access to York/ESG's trade secrets, customer and business information, including that of a confidential or proprietary nature; a covenant not

---

[5]Comfort Systems USA (Southeast), Inc., the named defendant herein, is a subsidiary of Comfort Systems USA and is referred to throughout as "Comfort Systems." As set forth below, testimony indicates that Rumore initially was hired as a consultant with Comfort Systems USA in the Bristol, Tennessee, division.  Shortly thereafter, he was brought over as a consultant for the newly formed Southeast division.

[6]Although not pertinent to the instant motion, Plaintiff also contends that Rumore engaged in other improper handling of accounts, such as duplicative accounting of contracts; failing to delete cancelled accounts from the accounts receivable system; and signing off on an air conditioning system, charging it to a customer's account, and then converting the system for his own use.  Finally, Plaintiff alleges that Rumore has refused to return property belonging to Johnson Controls, including a Dell laptop computer and all of Johnson Controls's business information contained on the hard drive, a cellular telephone, and a credit card.  (Doc. 20 at ¶¶ 39-44).

5

to disclose or use confidential and proprietary information; as well as a two-year covenant not to compete or solicit York/ESG employees and customers. *Id.* at ¶ 2(a)-(c). The Nulton Agreement also calls for a presumption of irreparable harm that may be remedied by enforcement of the agreement, injunctive relief, and attorney's fees and costs. *Id.* at ¶ (4)(a)-(b). Unlike the Rumore Agreement, the Nulton Agreement also addressed successor rights:

> This Agreement contains the final and entire agreement between the parties as to the subject matter contained in it. <u>All terms and provisions shall apply to and bind the successors and assigns of the respective parties.</u> This Agreement may be altered or amended only by written agreement signed by the parties.

*Id*. at ¶ 7 (emphasis added).

Nulton resigned from Johnson Controls on April 17, 2007. Plaintiff alleges that since his resignation, Nulton has breached his Agreement by becoming employed by Comfort Systems; actively recruiting Johnson Controls's customers and employees; and using Johnson Controls's proprietary business information, including its trade secrets.

As for Comfort Systems, Plaintiff alleges that company has obtained and therefore misappropriated its confidential information including its customer maintenance information; it has knowingly induced Rumore, Nulton, Wherrell, and Griffin into breaching their restrictive covenants; and it has interfered with Plaintiff's business relationship with customers, including GE Aviation, by inducing these employees to breach their restrictive covenants. Finally, it alleges Comfort Systems has been unjustly enriched through its acquisition of such trade secrets and confidential information.

6

B.

By the instant motion, Plaintiff generally seeks to enjoin the individual Defendants from continuing to breach their respective restrictive covenants and all Defendants from disclosing or using its trade secrets and confidential information.  More particularly, it seeks to enjoin individual Defendants from (1) performing any further services as salespersons (or any similar position) for Comfort Systems for a period of six months for Rumore and two years for Nulton from the date of the injunction; (2) disclosing or using Johnson Controls's trade secrets and confidential information at any time; (3) soliciting Johnson Controls's customers for a period of six months for Rumore and two years from Nulton from the date of the injunction; and (4) otherwise violating the Agreement; and (5) awarding Plaintiff fees and costs pursuant to Florida Statutes § 542.335(k).  (Doc. 23 at 1-2, 20).

Plaintiff contends that the restrictive covenants are reasonable in time, scope of business, and geography and that injunctive relief is necessary to protect its legitimate business interests and goodwill from the Defendants' misuse of trade secrets and confidential information and the individual Defendants' damaging actions, including breaches of their covenants not to compete, not to solicit Johnson Controls's customers, not to solicit Johnson Controls's employees, and not to disclose Johnson Controls's confidential information, including its trade secrets.[7]  Plaintiff asserts that its success in the industry is based on its

_____

[7]Plaintiff generally alleges that it has a legitimate business interest in protecting its confidential and proprietary pricing and customer information.  It urges it vigorously maintains the confidentiality of its pricing to customers and its customer account histories and maintenance requirements and that it has invested significant time, money, and energy into developing relationships and goodwill with its customers.  It asserts that each of the individual Defendants had access to this sensitive information on a daily basis.

relationships with its customers and the knowledge acquired from them, and that it has suffered

and will continue to suffer irreparable harm as a result of Defendants' misappropriation of

confidential information and trade secrets, in particular, customer maintenance and service

agreements and pricing information.  Plaintiff further argues that injunctive relief is necessary

to protect Johnson Controls's goodwill with its clients and to prevent the unjust enrichment of

its competitors.

Defendants Comfort Systems, Rumore, and Nulton filed a memorandum in opposition

(Doc. 69) arguing that the Agreements are unenforceable or that there is no breach warranting

the entry of a preliminary injunction.

## II.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary

injunction.  The purpose of a preliminary injunction is to maintain the *status quo* until the court

can enter a final decision on the merits of the case.  *United States v. DBB, Inc.*, 180 F.3d 1277

(11th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of

success on the merits; (2) a substantial threat of irreparable injury if the injunction is not

granted; (3) the threatened injury to the moving party outweighs whatever damage the

proposed injunction may cause the opposing party; and (4) if issued, the injunction would not

be adverse to the public interest.  *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr,*

*S.A.*, 320 F.3d 1205 (11th Cir. 2003); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306

(11th Cir. 1998); *Haitian Refugee Ctr., Inc. v. Baker*, 949 F. 2d 1109, 1110 (11th Cir. 1991).

8

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Seigel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Seigel*, 234 F.3d at 1180 (citations omitted). A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.05(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

III.

A.

Before reaching the Plaintiff's allegations of breach of contract by the Individual Defendants, the court must first make a determination as to the validity and enforceability of the Rumore and Nulton Agreements (collectively, the "Agreements"), which are governed by the Florida Trade Secrets Act, Florida Statutes section 542.335.[8] This section defines the

---

[8]The Agreements contain a forum selection and choice of law provision specifying that the laws of the state of Pennsylvania will govern the Agreements and their construction. *See* Rumore Agreement (Doc. 20, Exh. A at ¶ 9); Nulton Agreement (Doc. 20, Exh. B at ¶ 6). Plaintiff contends that there is no substantive difference between Florida law and Pennsylvania law. The parties have both applied Florida law, and the contract was entered into and allegedly

9

term, "legitimate business interest," to include trade secrets, as defined in § 688.002(4);

valuable confidential business or professional information that otherwise does not qualify as

trade secrets; substantial relationships with specific prospective or existing customers or

clients; and customer or client goodwill associated with a specific marketing or trade area. *Id.*

at § 542.335(1)(b).  A restrictive covenant not supported by a legitimate business interest is

unlawful and is void and unenforceable.  *Id.*

Johnson Controls describes itself as a leader in the building controls industry since its

founding in 1885.  Aff. of Milton Heather (Doc. 20, Exh. C at ¶ 6).  It appears undisputed that,

among other things, Johnson Controls engineers, manufactures, and installs building heating,

ventilation, air conditioning, lighting, and fire safety equipment.  It also provides maintenance

services of building control units.  *Id*. at ¶ 7.  Johnson Controls maintains, and it is not

otherwise shown by the Defendants, that it has developed and compiled valuable and

confidential business information, including system designs, maintenance schedules, service

agreements, specific customer requirements, pricing, sales and marketing techniques, market

---

breached in Florida.  Accordingly, the court applies Florida law herein.

Under Florida law, the party seeking enforcement of a restrictive covenant must initially plead and prove the existence of one or more legitimate business interests.  Fla. Stat. § 542.335(1)(b).  Next, the party must plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction.  *Id.* at § 542.335(1)(c).  Upon such a showing, the burden shifts to the party opposing enforcement to establish that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests.  *Id.*  If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests.  *Id.*

trends, and customer goodwill, *see* (Doc. 20 at ¶ 13-14), which are legitimate business interests intended to give Johnson Controls a competitive advantage in the market.

Johnson Controls also exercises measures to protect the confidentiality of such business information, including its utilization of nondisclosure, nonuse, nonsolicitation, and noncompete covenants in its employment agreements. *Id.* at 14-15. By it argument, it has legitimate business interests in protecting such confidential and proprietary information through enforcement of these Agreements.

In contrast, Defendants' response urges that Plaintiff cannot identify any particular legitimate business interest it seeks to protect by enforcement of the Agreements. Defendant argues that it is not a direct competitor of the Johnson Controls and that Johnson Controls employees received no special training or proprietary or confidential information while in its employ that is useful to any of the work of Comfort Systems. *See* (Doc. 69 at 11).

The proffered evidence fairly reveals that Johnson Controls develops and maintains customer lists, business, service and maintenance plans, sales, revenue and financial information, including pricing information, and other proprietary information, that, even if not trade secret information, may properly be considered as confidential business information that it attempts to protect through the use of employment contracts and restrictive covenants such as those within the Rumore and Nulton Agreements. The evidence also reveals that the individual Defendants would have had access to such customer lists, service agreements, maintenance information and pricing information. Given that Johnson Controls and Comfort Systems compete in the relevant market, the court finds that Plaintiff has demonstrated legitimate business interests that justify the restrictions.

11

With respect to Rumore, there is an additional preliminary consideration as to the enforceability of the Agreement.  It is undisputed that Rumore entered into his Confidentiality and Non-Competition Agreement with York/ESG, (Doc. 20, Exh. A), and when Johnson Controls purchased York/ESG, it did not receive from Rumore a new agreement governing Rumore's post-employment, competitive activities.  Dep. of Milton Heather (Pl.'s Hrg. Exh. 1, Tab 8 at 14).  Defendants contend that because the Rumore Agreement contains no express authorization for enforcement of the contract by a successor company as required by Florida law, Johnson Controls cannot seek to enforce the restrictive covenants.[9]

Plaintiff urges that its acquisition of York/ESG was by way of 100% stock purchase and the companies seamlessly merged and carried on the business.  Service branch manager Milton Heather testified,

> All employees came over *status quo* because we -- we physically bought all the assets.  We basically purchased their entire stock.  It was seamless to both companies.  They integrated together, you know, basically without any major disruptions or changes. . . . It was announced in our headquarters, I was physically in the headquarters when it was announced, that as of the date and as cc'd paperwork, that York was purchased by Johnson Controls, and that, you know, the two companies would be integrated.

---

[9]It appears that Plaintiff sought to have Rumore sign a new noncompete agreement on one or more occasions.  When Rumore left Plaintiff's employ, its HR representative, Derrell Martin, attempted to have Rumore sign one of Plaintiff's noncompete agreements, ostensibly to assure additional time on his noncompete status.  Tele. Dep. of Derrell Martin (Pl.'s Hrg. Exh. 1, Tab 13 at 28-29).  According to counsel, Plaintiff's noncompete includes the missing language related to the enforceability of the agreement by successors.  Rumore recalls that Plaintiff twice attempted to get him to sign another noncompete, once after the merger and another when he left.

Milton Dep. (Pl.'s Hrg. Exh. 1, Tab 8 at 10-11).  Therefore, Plaintiff maintains that the

Rumore Agreement is as fully enforceable as if York/ESG were seeking to enforce it, and the

Defendants' legal position is without merit.

Defendants cite to Florida Statutes section 542.335(1)(f)(2), which provides in

pertinent part:

> The court shall not refuse enforcement of a restrictive covenant
> on the ground that the person seeking enforcement is a third-
> party beneficiary of such contract or is an assignee or successor
> to a party to such contract, provided: . . .
> In the case of an assignee or successor, <u>the restrictive covenant
> expressly authorized enforcement by a party's assignee or successor.</u>

*Id.* (emphasis added).  By the Defendants' reading of this language of the statute, the

successor of a party to a contract containing a restrictive covenant may seek enforcement of

the restrictive covenant *only* if the restrictive covenant expressly authorizes enforcement by a

party's successor.  *See Marx v. Clear Channel Broadcasting, Inc.*, 887 So. 2d 405, 408 (Fla.

Dist. Ct. App. 2004) (under section 542.335(1)(f)(2), "non-competition agreements can be

enforced by assignees, but only if the agreement expressly so provides. . . . Thus, . . . the non-

competition clause in this case is not enforceable by the assignee."); *Leesburg Cmty. Cancer

Ctr. v. Leesburg Reg. Med. Ctr., Inc.*, -- So. 2d --, 2007 WL 3302439 (Fla. Dist. Ct. App.

Nov. 9, 2007) ("[C]ourts should not interpret contracts in a manner that extends or enlarges

the obligations of a contracting party beyond the plain meaning of the language used in the

contract itself".).  Defendants urge that *Corporate Express Office Products v. Phillips*, 847

So. 2d 406 (Fla. 2003), is not controlling in this instance because the agreements in that case

13

were construed under common law, as the actions occurred before the statutory amendments took effect.

With the enactment of section 542.335 in 1996, Florida repealed the predecessor statute, section 542.33, which contained no mention of assignments or successor rights.  1996 Fla. Sess. Law Serv. ch. 96-257 (West).  Defendants argue that by the addition of this successor employment language of section 542.335(1)(f), the Legislature sought to change the law to require noncompetition agreements to have this language in order for there to be successor enforcement.  *See* (Doc. 69 at 8) (citing *Carlile v. Game & Fresh Water Fish Comm'n*, 354 So. 2d 362, 364 (Fla. 1977) ("when a statute is amended, it is presumed that the Legislature intended it to have a meaning different that accorded to it before the amendment.").

Contrary to the position urged by Defendants, I do not read the "plain language" of subsection 542.335(1)(f)(2) as do the Defendants, nor can I construe it to require noncompetition agreements to contain express authorization for enforcement by a successor in circumstances such as those at hand.  A plain reading of this provision is that <u>if</u> a noncompetition agreement contains an express authorization for enforcement by a successor, the court "shall not refuse enforcement" of the contract.  *See id.*  In other words, if the parties have agreed to and contracted to allow enforcement of the contract by a successor party, the court lacks the discretion to deny enforcement of the contract because the successor was not an original signatory.  I find this conclusion consistent with both the plain language of the statute and dictated by controlling Florida law on such matters.

14

In *Corporate Express*, the Florida Supreme Court determined that a successor corporation's ability to enforce noncompete agreements entered into between employees and the predecessor corporation depends on the type of business transaction or transfer. *Id.* at 414. Specifically, the court determined that in the cases of (1) a 100 percent stock purchase in which the corporate entity is unchanged except for a change in name or management; (2) a corporate merger in which two corporations unite into a single corporation and the surviving corporation assumes the rights and liabilities of the merging corporation; or (3) where a corporation merely undergoes a name change, the surviving corporation assumes the right to enforce a noncompete by operation of law and no assignment is necessary.[10]

While the Defendant is correct that the court's holding in *Corporate Express* is based primarily upon the common law of corporations, the court also bases its ruling upon Florida statutory law governing merger, which provides that the "surviving corporation of a merger 'shall have all the rights, privileges, immunities and powers, and shall be subject to all of the duties and liabilities' of the merged corporation." *Id.* at 413 (discussing Fla. Stat. § 607.1106, which is unchanged from its predecessor statute, section 607.231(3), applicable at times pertinent to the case). Significantly, though the contract in question in *Corporate Express* was entered into prior to the enactment of section 542.335, the court concluded that, under the common law governing commercial transactions and under applicable statutes, the contract

---

[10]In contrast, in a sale or purchase of corporate assets alone, the acquiring business does not as a matter of law assume the liabilities of the predecessor business, since the selling corporation may continue in existence, dissolve, or merge with the purchasing entity. *Id.* at 412. "Thus, when the sale of the assets includes a personal service contract that contains a noncompete agreement, the purchaser can enforce its terms only with the employee's consent to an assignment." *Id.* at 413.

15

may be enforced by a successor without an assignment.[11]  I cannot read the statutory language

relied upon by the Defendants as intended to or in fact altering these basic principles.

Upon Plaintiff's *prima facie* showing that the restrictions are reasonably necessary to

protect its legitimate business interests, the party opposing enforcement has the burden of

showing that the restraint in question is overbroad or overlong, or not reasonably necessary to

protect the legitimate business interests.  Fla. Stat. § 542.335(1)(c).  If the court finds that a

contractual restraint is overbroad, overlong, or otherwise not reasonably necessary to protect

the legitimate business interest or interests, it "shall modify the restraint and grant only the

relief reasonably necessary to protect such interest or interests."  *Id.*[12]  Plaintiff argues first that

the restrictive covenants range from six months (Rumore) to two years duration (Nulton), and

that both are reasonable in light of Fla. Stat. § 542.335(1)(d).  I agree.

While the Agreements contain no express provision defining the geographic scope of

the contract, Plaintiff argues that the geographic restrictions under the Agreements are

reasonable, as they "simply prevent[] Individual Defendants from competing with Johnson

---

[11]Another subsection guides the court's construction:

> A court shall construe a restrictive covenant in favor of providing
> reasonable protection to all legitimate business interests established by
> the person seeking enforcement.  A court shall not employ any rule of
> contract construction that requires the court to construe a restrictive
> covenant narrowly, against the restraint, or against the drafter of the
> contract.

Fla. Stat. § 542.335(1)(h).

[12]Each of the Agreements also contains a provision that allows for partial enforcement
of the contract or modification of the contract so that it is enforceable.  *See* Rumore
Agreement (Doc. 20, Exh. A at ¶¶ 10); Nulton Agreement (Doc. 20, Ex. B at ¶

Controls within any city, town, or county in which Johnson Controls does business and the Individual Defendants work." (Doc. 23 at 18). It adds, "The Individual Defendants['] territory for Johnson Controls encompassed from Ocala, Florida south to Naples, Florida. Thus, the Individual Defendants are free to obtain gainful employment in any other area in Florida outside this scope." *Id.* As narrowed, this geographical scope related to the solicitation issues appears reasonable to protect Plaintiff's business interests.[13] Finally, Defendants make no good contrary showing to Plaintiff's that it needs such restrictions to protect its legitimate business interests.

### B.

Having determined that both the Rumore and Nulton Agreements are enforceable by Plaintiff in the given circumstances, the court must next determine whether Plaintiff has satisfied the requirements of Rule 65 for injunctive relief as to each of the remaining defendants.

The focus of Plaintiff's proffer at the hearing centered on its likelihood of success on the allegations that Rumore and Nulton solicited Plaintiff's customers and former employees and all the Defendants have misused its confidential or proprietary information. Regarding Rumore, Plaintiff's proffer includes the testimony of Johnson Controls's employees and former employees who were directly or indirectly solicited by Rumore to work for Comfort Systems.

---

[13]This geographic scope would seem to exclude Nulton from inclusion in any injunction since he has worked only in Bristol, Tennessee, since leaving Plaintiff. However, Plaintiff contends the geographic scope applicable to the misappropriation of trade secrets or other confidential information is not so limited. Plaintiff proposes a separate broader geographic scope where the offending conducting involves misuse of such confidential matters.

17

By its allegations, the result was "mass exodus" of employees solicited by Rumore, including Lisa Garland, Andrew Flowers, Eric Kepner, Darby Beckner, Joe Beauvais, and Steve Griffin. Heather Dep. (Pl.'s Hrg. Exh. 1, Tab 8 at 21). Employees who were solicited but stayed with Johnson Controls include Bob Mullins, David Limbocker, Chris DeAngelis, Matthew Leheup. *Id.*; Dep. of Mike Wade (Pl.'s Hrg. Exh. 1, Tab 19 at 42-43); Dep. of Andrew Flowers (Pl.'s Hrg. Exh. 1, Tab 5 at 21). This proffered testimony clearly establishes that Rumore did solicit several of Plaintiff's employees.[14]

As for the disclosure of and solicitation of its customers, Plaintiff contends correctly Rumore was brought into Tampa for the express purpose of developing a customer base. On an early trip to Tampa with Mike Wade, the CEO of Comfort Systems, Rumore spoke of customers who were Plaintiff's customers, including Cardinal Health and PMI. It maintains that Rumore thereafter solicited GE Avionics f/k/a Smiths Aerospace, Inc., a company that did in fact cancel a contract with Plaintiff and signed on with Comfort Systems. Flowers Dep. (Pl.'s Hrg. Exh. 1, Tab 5 at 64); Wade Dep. (Pl.'s Hrg. Exh. 1, Tab 19 at 66); Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 109). In addition, it maintains that Rumore directly or indirectly through his employees solicited other customers of Johnson Controls, including Pinellas County Schools, Paint Ball Industries (a/k/a PaintBall PMI or Kee Action Sports), and Cardinal Healthcare and sought bids from entities on Plaintiff's customer list. Heather Dep. (Pl.'s Hrg. Exh. 1, Tab 8 at 23-24); Flowers Dep. (Pl.'s Hrg. Exh. 1, Tab 5 at 52-53); David Limbocker (Pl.'s Hrg. Exh. 1, Tab 11 at 14-15, 17-18).

---

[14]At arguments, Rumore's counsel conceded the Plaintiff's showing regarding the solicitation of Plaintiff's employees.

18

Plaintiff further urges that Rumore (as well as Nulton) have misused its confidential or trade secret information in soliciting such bids.  Both Rumore and Nulton have conceded that some of the information they learned while in the employ of Plaintiff was confidential or proprietary in nature like customer specific information such as maintenance or service agreements and pricing matters.  Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 47-49); Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 34).  Rumore would also have been privy to Plaintiff's markup and margins, so-called "price point" information, as well as Plaintiff's cost structure, information used by Plaintiff in bidding its jobs.  Heather Dep. (Pl.'s Hrg. Exh. 1, Tab 8 at 28); Dep. of Steve Griffin (Pl.'s Hrg. Exh. 1, Tab 7 at 19-21) (testifying that Rumore was familiar with commission structure).  Garland would have been privy to Plaintiff's financial information, which was also considered confidential.  Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 10-11).

Defendants argue that Plaintiff cannot establish a likelihood of success on any claim. They urge that there is no real proof that Rumore or any Defendant solicited any of Johnson Control's customers or used any confidential or proprietary information; Rumore's Agreement is unenforceable because the six-month time limits on the restrictive covenants have expired; and Plaintiff's course of conduct following its acquisition of York/ESQ either modified or rescinded Rumore's contract with York/ESG, given that after the Johnson Controls takeover, Rumore's job benefits and responsibilities were substantially changed, and he was asked to sign another noncompete agreement, which he declined to do.  Stated otherwise, Plaintiff's conduct after the merger evidences its recognition that the earlier noncompete was unenforceable, and it cannot now take a different position.  Defendants proffer the deposition testimony of

19

Rumore that he declined to sign any noncompete with Plaintiff, *id.* at 143-44; that he does not

possess any confidential or trade secret information of Plaintiff not otherwise publically

available; and that he has not improperly shared any documents or information belonging to

Johnson Controls.  *Id.* at 49, 108.

According to Rumore, potential customers of Comfort Systems were identified by his

independent research and by making cold calls.  *Id.* at 23-24.  GE Aviation approached

Comfort Systems, not vice versa, because of the service and billing by Plaintiff and the bid was

handled by Flowers, who was not bound by any noncompete agreement with Plaintiff.  Flowers

Dep. (Pl.'s Hrg. Exh. 1, Tab 5 at 6, 68-69); Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 109).

Similarly, customer contact with PMI was handled by Flowers, not Rumore.  In the case of

Pinellas County Schools, Rumore contends he went online and registered as a vendor to submit

a bid on a matter that had nothing to do with the maintenance contact held by Plaintiff.

Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 112).  Defendants also proffer testimony from a

couple of former employees of Plaintiff who came to work with Comfort Systems that they did

not receive special training or confidential information from Plaintiff.  Dep. of Eric James

Kepner (Pl.'s Hrg. Exh. 1, Tab 9 at 13, 18); Dep. of Lisa Garland (Pl.'s Hrg. Exh. 1, Tab 6 at

9, 29, 35); *see also* Rumore Dep. (Pl.'s Hrg. Exh. 1, Tab 17 at 22) (testifying that he received

an initial training class, which Rumore described as "a general HVAC overview training");

Flowers Dep. (Pl.'s Hrg. Exh. 1, Tab 5 at 11) (testifying that he only received on-the-job

training but no schooled training).

According to Plaintiff's proffer, which, at this stage of the proceedings, I find credible, Plaintiff and Comfort Systems compete directly for certain types of service and maintenance business in the Central Florida market and elsewhere.  When Rumore resigned from Johnson Controls on May 1, 2007, he immediately went to work as a consultant for the Comfort Systems entity in Bristol, Tennessee.  In or about August 2007, Rumore was tasked to relocate to Tampa, Florida, and set up and staff a new "Southeast" division for Comfort Systems.  Mike Wade, CEO of Comfort Systems USA (Southeast), describes Rumore as a leader and business manager over the Tampa office.  While initially hired as a consultant, it is anticipated that Rumore would move into a  fulltime position with that business unit.  Dep. of Mike Wade (Pl.'s Hrg. Exh. 1, Tab 19 at 71).  The Tampa office began operations in September 2007, and since that time, Rumore has directly and indirectly solicited several Johnson Controls employees to leave their employment for work with Comfort Systems.  He has also overseen the efforts by his hires to solicit new business for Comfort Systems in competition with Plaintiff.  In at least one instance, a customer under contract with Plaintiff, GE Aviation, cancelled its contract with Johnson Controls and negotiated a new contract with Comfort Systems for the same service at a lower price.  While this contact may have been pursued directly by Flowers, Flowers was hired by Rumore and worked directly with him.[15]  It would be entirely naive to conclude that Rumore did not participate, at least indirectly, in securing

---

[15]Plaintiff's contention that Flowers, who was not subject to a noncompete covenant with Plaintiff, was brought in specifically to assist Rumore in side-stepping his own noncompete restrictions may have some merit, given that Rumore sought to hide behind Flowers in a number of matters.

this client away from Plaintiff on a bid which undercut the contract price with Plaintiff.  He clearly did nothing to prevent it.  Other customers of Plaintiff have also been solicited.  In short, Plaintiff is likely to prevail on its solicitation claims as against Rumore.

Even though Defendants insist that Rumore has not used any of Plaintiff's information or documents with Comfort Systems, Rumore acknowledges that during his tenure with Plaintiff, he had access to company information and documents which the company considered confidential and proprietary.  Clearly, he possessed much of Plaintiff's service information and knowledgeable of its customers and service arrangements with them, as well as pricing and cost information, matters necessary to bid on this type work.  At this stage of the proceedings, the court is not in a position to make credibility determinations as to particular witness testimony, and the Plaintiff's proffer is not as clearly revealing regarding Rumore's actual use of such proprietary or confidential information at Comfort Systems.  However, given what Rumore was tasked to do in developing a new customer base, it would again be naive to conclude that Rumore has not or will not use such information to the benefit of his new employer and, in the service areas where the companies compete, to the competitive disadvantage of Plaintiff by seeking to underbid it.  Such inside information provides Comfort System with a competitive advantage that it would not have without Rumore.

In sum, I conclude that Plaintiff has demonstrated a likelihood of success on several of its claims that Rumore is in breach of the Agreement and that his ongoing efforts to compete against Johnson Controls poses a present threat to Plaintiff such that it may seek the remedies specified in the Agreement, including preliminary injunctive relief.

22

With respect to William Nulton,[16] the Plaintiff's proffer establishes that in or about

1994, York International hired him as a field wage employee, and Nulton progressed through a

number of positions.  (Pl.'s Hrg. Exh. 1, Tab 16 at 9-10).   In February 2004, Nulton entered

into his Agreement with York/ESG.  (Doc. 20, Exh. B).   Nulton continued to work as a

branch service manager for the Tampa office after the acquisition of York/ESG by Plaintiff in

December 2005.  Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 9).   In May 2007, after resigning

from Plaintiff, he took a position as vice-president of service operations for Comfort Systems

U.S.A. (Bristol), located in Bristol, Tennessee.  *Id.*

By Plaintiff's allegations, Nulton also breached his noncompete agreement by going to

work for Comfort Systems; by soliciting Plaintiff's employees and its customers; and by using

Plaintiff's confidential and proprietary information and trade secrets.   In the case of Nulton, the

proffered evidence is considerably thinner.   Indeed, it is difficult to conclude on Plaintiff's

proffer that Nulton has done anything in direct competition with Comfort Systems through his

work in Bristol, Tennessee.   As for the allegations that Nulton has solicited Plaintiff's

employees, Plaintiff identifies those employees as Rumore, Lisa Garland, Mark Nash, Steve

Griffin, Robert Mullins, Ron Larson, and Gary Dillon and urges that any contact Nulton had

with these former employees in which he discussed Comfort Systems favorably was a breach of

the nonsolicitation provision.   Nulton acknowledges that he was contacted by and spoke with

Rumore, Garland, Mullins, Larson and Dillon; however, he represents that he simply answered

---

[16]Unlike with the Rumore Agreement, the Nulton Agreement contains an express
provision that binds the successors of the parties, (Doc. 20, Exh. B at ¶ 7), and the Plaintiff's
ability as a successor to enforce the agreement is not at issue.

their questions about Comfort Systems but made no solicitation on the company's behalf. Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 19-21, 38); Garland Dep. (Pl.'s Hrg. Exh. 1, Tab 6 at 17, 18).   He acknowledges that one of Plaintiff's employees, Mark Nash, contacted him and was subsequently hired in Bristol, but he denies playing a role in that hiring except to refer him to the company president.   Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 37).   He also denies having anything to do with the hiring of Griffin in Florida.   *Id.* at 28-29.   This testimony is largely corroborated by other deposition testimony.   *See* Nash Dep. (Pl.'s Hrg. Exh. 1, Tab 15 at 9, 37); Mullins Dep. (Pl.'s Hrg. Exh. 1, Tab 14 at 11-12); *see also* Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 20-23, 38); Griffin Dep. (Pl.'s Hrg. Exh. 1, Tab 7 at 39-40).   As for the solicitation of Plaintiff's customers, Plaintiff vaguely contends that Nulton has and continues to recruit its customers, but there is a dearth of evidence at present that he has done so in the pertinent geographic area.   Nulton flatly denies this allegation.   Nulton Dep. (Pl.'s Hrg. Exh. 1, Tab 16 at 12, 40, 44).   On the proffered evidence, I cannot conclude that Plaintiff is substantially likely to succeed on it solicitation claims against Nulton.

As for the allegations of Nulton's misuse of confidential or proprietary information or trade secrets, the allegations are rather vague and the proof again thin.   As indicated above, while Nulton concedes that he had access to confidential and proprietary information including pricing and customer arrangements, he denies disclosing or using such information in his current position.   *Id.* at 44.   At present, Plaintiff has made no good showing that Nulton's employment with Comfort Systems (Bristol) has resulted in misappropriation or misuse of

24

trade secrets or confidential information or that his mere possession of such offers any type

unfair competitive disadvantage to Comfort Systems.

     In sum, I find that at present, the Plaintiff has failed to demonstrate a likelihood of

success (or irreparable harm) at the hands of Nulton, on its breach of contract and

misappropriation claims and Plaintiff's motion should be denied with respect to this Defendant.

     With respect to Comfort Systems, Plaintiff's claims of misappropriation are closely

linked to its claims against Rumore and the alleged solicitation of Johnson Controls's

customers.  From Plaintiff's standpoint, through former Johnson Controls employees such as

Rumore, Comfort Systems has wrongfully obtained trade secret or other confidential

information that helped the company undercut Johnson Controls's pricing on current contracts,

such as the GE Aviation contract, and underbid Johnson Controls on new jobs such as the

Shands contract.  *See* Aff. of Corrine Feehan (Doc. 23, Exh. G at ¶¶ 7,8).  Plaintiff urges that

Comfort Systems benefitted from such activities, even though it was aware of the restrictive

covenants binding certain former Johnson Controls employees.  Comfort Systems contends

that at least initially, it was unaware that Rumore had a noncompete agreement.  Defendants

asserts that Comfort Systems is engaged in a different business than Johnson Controls and is

not a direct competitor.  More specifically, Defendants characterize Comfort Systems as a

mechanical contractor whose technicians work on various equipment from different companies,

whereas Johnson Control is a manufacturer of equipment and controls and services only its

own products.  *See* Dep. of Chris DeAngelis (Pl.'s Hrg. Exh. 1, Tab 3 at 21-24).  Finally,

Defendants contend that even if they were competitors, price and bidding information

maintenance schedules and services are not confidential, and at any rate, Comfort Systems has not used and does not use the same data and program to compute its own bids.

These assertions of Comfort Systems are disingenuous. The proffered evidence establishes that Johnson Controls and Comfort Systems submitted competing bids on the same projects and have otherwise courted the same customers. There is little doubt that the two companies are in direct competition in at least some aspects of their businesses, even if the two offered some different products and services. Moreover, Plaintiff has proffered convincing evidence of Rumore's involvement, either direct or indirect, in pricing and preparing bids and overseeing operations in competition with Johnson Controls. Rumore was a key employee in starting up the Tampa office of Comfort Systems and has played a central role in whatever success it has enjoyed. Again, it would be naive to ignore such evidence of unfair competitive advantage given to and enjoyed by Comfort Systems through Rumore's breaches. Therefore, on the evidence before the court at this stage of the proceedings, I find that Plaintiff has also demonstrated a likelihood of success on at least some of its allegations asserted against the corporate defendant.

As to the second requirement, Plaintiff argues that it has suffered and continues to suffer irreparable injury because of Defendants' actions. Under Rule 65, the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. Lepore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of*

*Jacksonville*, 896 F.2d at 1285.  The possibility that adequate compensatory relief will be available at a later date, in the ordinary course of litigation, weighs heavily against injunctive relief.  *Id.*  A plaintiff may, however, establish irreparable injury where the total damages associated with plaintiff's losses, such as loss of customer goodwill and loss of fair competition, would be difficult to calculate.  *Id.*  The Florida Supreme Court has held that where a defendant has breached a covenant not to compete, "[t]he Court may award damages . . . but the normal remedy is to grant an injunction. This is so because of the inherently difficult task of determining just what damage is actually caused by the employee's breach of the agreement." *Miller Mech., Inc. v. Ruth*, 300 So. 2d 11 (Fla. 1974), *quoted in Variable Annuity Life Ins. Co. v. Hausinger*, 927 So. 2d 243, 245 (Fla. Dist. Ct. App. 2006).

While Plaintiff is able to quantify damages as to some of its claims,[17] some of the alleged harm caused by Rumore's breach is not calculable and compensable with monetary damages.  Specifically, Plaintiff asserts the Defendants' breaches have damaged Johnson Controls' legitimate business interests, its customer goodwill, and competitive advantage, all of which have all been impacted by Rumore's actions.  The proffered evidence indicates that Plaintiff invests considerable resources in its business interests and the restrictive covenants are designed to protect its investments.  Not all that damages its business interests or harms its

---

[17]For example, Plaintiff values the loss of the GE Aviation contract at $295,785.00; $300,000 a year based on lost revenue of mechanics recruited by Rumore plus costs of replacement.  *See* Complaint (Doc. 20 at ¶¶ 31, 35); Heather Aff. (Doc. 20, Exh. E, at ¶¶ 25, 28).  The Agreement itself contains damage calculations for certain breaches; for example, in Paragraph 4 of the Agreement, the parties agreed that the damage for solicitation of employees is quantified by Rumore's annual salary ($72,450.00 at the time of his termination) times the number of employees he solicited or induced to leave Johnson Controls.

competitive advantage are easily quantifiable in purely monetary terms.  Here, for instance, the measure of it damages in monetary terms due to the loss of key employees who suddenly began working for a competitor and the impact of the same on its hard earned goodwill is not easily quantifiable in monetary terms nor is the loss of competitive advantage experienced when a former key employee, possessed of proprietary or confidential information, begins using such knowledge in bidding against it.

At any rate, the relevant statute provides that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."  Fla. Stat. ch. 542.335(1)(j).  Neither Rumore nor Comfort Systems have rebutted this presumption as to matters such as goodwill and competitive advantage.  Further, by his agreement, Rumore agreed to injunctive relief as an available remedy in case of his breach. (Doc. 20, Exh. A at ¶ 7).  Therefore, in accord with Florida law, the court finds that the Plaintiff will suffer irreparable harm if an injunction to maintain the *status quo* is not issued.

A balancing of the equities also favors the Plaintiff.  The court finds the potential harm to Plaintiff if a preliminary injunction is not entered against Rumore and Comfort Systems outweighs the detriment to these Defendants that will result from a preliminary injunction.  While the injunction will sever the business relationship between Rumore and Comfort Systems for a time, neither is deprived of the opportunity for work.  In the circumstances, the equities favor enforcing the agreement against both in order to level the competitive playing field and permit Plaintiff to protect substantial investment in its business, customer goodwill, trade

28

secrets, and contractual rights during the six-month term of the injunction.[18]  Rumore may seek

work of a different type elsewhere, and Comfort Systems must only be required to compete

fairly with Plaintiff in its bidding and courting of new customers, which, in the current

circumstances, should not be considered a "harm" that would render injunctive relief

inequitable.

      Finally, the entry of a preliminary injunction would not disserve the public interest.  An

injunction of limited scope, enforcing the Agreement for six months and prohibiting the misuse

of confidential or proprietary business information until a final resolution on the merits can be

reached is entirely consistent with the public interest in these matters.  Indeed, the failure to

enforce the restrictive covenants in any manner in the face of clear violations disserves the

interest of the public in promoting contracts and fair competition.  In the absence of such

preliminary relief, former employees could unfairly use the benefits bestowed on them by the

employer with near impunity for an indefinite period of time.  At least one court has found that

such circumstances could discourage employers from properly training and informing its

employees, thus disserving the public interest.  *Corp. Exp. Office Prods.*, 2002 WL 1901902,

at * 28.  Therefore, I conclude that an injunction enforcing the Rumore Agreement and

restraining the unfair competition of Rumore is not inimical to the public interests.

---

[18]Defendants argue in passing that the time periods restricting his activities have expired and therefore cannot now be enforced.  However, courts the courts have held that the time period may be appropriately tolled pending a motion for temporary or preliminary injunctive relief.  *Polaris Pool Sys., Inc. v. Great Am. Waterfall Co.*, No. 8:05-cv-1679-TTGW, 2006 WL 289118, at *6 (M.D. Fla. Feb. 7, 2006).

IV.

Having found that the Rumore Agreement (Doc. 20, Exh. A) is enforceable as a matter of law and that Plaintiff has proffered evidence demonstrating that preliminary injunctive relief is appropriate to enforce the restrictive covenants, it is recommended that the court GRANT in part the Plaintiff's motion and enter a preliminary injunction limited in scope so as protect Plaintiff's legitimate business interests as follows:

(1)     Enjoin Defendant Rumore from maintaining any business relationship of any sort, directly or indirectly, with Comfort Systems and its related entities or any other entity engaged in competition with Plaintiff and covered by the Agreement, and from engaging in any form of solicitation of Plaintiff's employees or the disclosure of or solicitation of Plaintiff customers for any purpose in breach of the Agreement for a period of six months from the date of the injunction; and

(2)     Enjoin Rumore and Comfort Systems from using or employing in any way at any time any trade secret or confidential or proprietary information of the Plaintiff, whether in direct competition with the Plaintiff or otherwise, and that both be enjoined to return to Plaintiff any of its property obtained as a consequence of Comfort Systems's hiring of Rumore.

(3)     As a condition of this injunction, Johnson Controls should be required to post a cash or surety bond in the amount of $50,000.00 in a form acceptable to and

30

approved by the Clerk of Court for the United States District Court, Middle District of Florida.

(3)     It is further recommended that the court deny the motion in all other respects.

Respectfully submitted on this
23rd day of January 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record